# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4052-18
              A-4449-18

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

A.C.,

      Defendant,

and

M.H.,

      Defendant-Appellant,

and

D.S.,

      Intervenor-Respondent.

_____

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

Plaintiff-Respondent,

v.

A.C.,

Defendant-Appellant,

and

M.H.,

Defendant,

and

D.S.,

Intervenor.

IN THE MATTER OF M.L.H., IV,
a minor.

Argued December 2, 2020 – Decided January 7, 2022

Before Judges Accurso, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket Nos. FN-08-0105-18 and FD-08-0440-17.

Clara S. Licata, Designated Counsel, argued the cause for appellant M.H. (Joseph E. Krakora, Public

Defender, attorney; Robyn A. Veasey, Deputy Public
Defender, of counsel; Clara S. Licata, on the briefs).

Beatrix W. Shear, Designated Counsel, argued the
cause for appellant A.C. (Joseph E. Krakora, Public
Defender, attorney; Robyn A. Veasey, Deputy Public
Defender, of counsel; Beatrix W. Shear, on the briefs).

Sara M. Gregory, Deputy Attorney General, argued
the cause for respondent New Jersey Division of Child
Protection and Permanency (Gurbir S. Grewal,
Attorney General, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Sara M.
Gregory, on the brief).

Margo E.K. Hirsch, Designated Counsel, argued the
cause for minor (Joseph E. Krakora, Public Defender,
Law Guardian, attorney; Meredith Alexis Pollock,
Deputy Public Defender, of counsel; Margo E.K.
Hirsch, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

These are appeals from a Title 30 section 12,[1] protective services, FN

action brought by the Division of Child Protection and Permanency, and an FD

---

[1] N.J.S.A. 30:4C-12 authorizes the Division to investigate complaints that a
parent or guardian of any child in this State "is unfit to be entrusted with the
care and education of such child, or shall fail to provide such child with proper
protection, maintenance and education, or shall fail to ensure the health and
safety of the child, or is endangering the welfare of such child." See N.J. Div.
of Youth & Family Servs. v. T.S., 426 N.J. Super. 54, 64 (App. Div. 2012)
(discussing standards for the Division's intervention under Section 12).

application for custody of the infant M.H. IV (Henry) brought by his maternal grandmother D.S. (Dahlia) that were heard together by the same trial judge.[2] Parents A.C. (Alice) and M.H. (Malcolm) appeal under separate docket numbers, consolidated here, from final orders terminating the FN action after approval of the Division's plan for termination of parental rights followed by adoption and awarding custody of Henry to Dahlia in the FD action, permitting his removal to her home in Virginia and relieving the Division from filing a guardianship complaint to terminate Alice's and Malcolm's parental rights.

Alice and Malcolm claim the court erred in permitting Dahlia to intervene in the FN matter; improperly relied on unspecified evidence from a prior FN action, as well as hearsay and inadmissible expert opinion, to support its findings in the present FN action and award custody to Dahlia in the FD action; that the combined proceedings denied them due process; and that they received ineffective assistance of counsel.

---

[2] The Family Part's FN docket encompasses child protective services and abuse and neglect cases, whereas the FD docket consists of child custody, visitation, child and spousal support and the like in non-divorce matters, see N.J. Dep't of Children & Families, Div. of Youth & Family Servs. v. I.S., 214 N.J. 8, 22 n.3 (2013), including non-parent relatives seeking custody, support or visitation, R.K. v. D.L., 434 N.J. Super. 113, 131 (App. Div. 2014). We use initials to protect the children's privacy, Rule 1:38-3(d)(12), and pseudonyms to make the opinion easier to read.

A-4052-18

The Division acknowledges the trial court erred in relying on unspecified findings in the prior FN proceeding and in relying on the expert opinion of a non-testifying expert. It nevertheless argues the record contains sufficient competent evidence to support the court's findings that Malcolm and Alice were unfit, and it was in Henry's best interests to transfer custody to Dahlia. The Division contends the court's decision to hear the FD matter in tandem with the FN action did not infringe defendants' due process rights; provided them the opportunity for counsel in the FD matter they would not have otherwise had; and shielded them from the real risk of termination of their parental rights, thus preserving for them the potential of reunification with Henry. It urges us to reject defendants' claims that they received ineffective assistance of counsel and affirm the trial court's orders.

Henry's law guardian echoes the arguments of the Division and contends the best interests standard employed by the trial court in awarding custody of Henry to his grandmother Dahlia was properly employed after it approved the Division's proposed permanency plan, finding neither parent fit to care for him. The law guardian contends the record contains ample evidence to support the trial court's finding of persistent domestic violence between Malcolm and Alice over several years despite the Division's many efforts to reunify the

A-4052-18

family, and urges we affirm the decision to award custody of Henry to Dahlia, who is already providing a home for four of Henry's siblings.

As we have observed before, linking a Division-instituted FN action with an FD application for custody is not a typical proceeding and requires the court and counsel to take particular care to ensure the protection of the parents' rights, especially when custody of the child in the FD action is sought by someone other than one of the parents. See N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 525 (App. Div. 2018). We agree with the Division and the law guardian that there is nothing inherently inappropriate with linking the two proceedings, whether or not the individual petitioning for custody in the FD action is permitted to intervene in the FN proceeding. See B.C. v. N.J. Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 205-08 (App. Div. 2017).

Linking the proceedings can provide some significant advantages to parents, providing them counsel in the FD matter and avoiding a guardianship action when a court has approved the Division's plan of termination of parental rights followed by adoption, thus preserving for them the potential for reunification while achieving a secure placement for the child. See S.D., 453 N.J. Super. at 524. But, as Alice and Malcolm argue, linking the proceedings

6

without scrupulous attention to the parents' rights in both the FN and FD actions can also result in an effective end of the parents' rights to raise their child, especially when the child is placed out-of-state, without the rigorous proofs required of the Division in a guardianship action. That very real danger requires the trial court to make meticulous factual and legal findings in each case and to ensure that counsel understand their responsibilities to their clients in the FN and FD proceedings.

We agree with defendants that this record does not reflect the care required in these joint FN and FD proceedings, particularly with respect to the court's reliance on unspecified evidence adduced in the prior proceedings and on expert opinion proffered by the Division from a witness it did not call to testify. Ordinarily, those errors would require us to vacate the court's final orders and remand for a new hearing. We do not do so here, however. Having reviewed the entire record — much of which we recount in what follows — we find ourselves in agreement with the Division and the law guardian that these joint proceedings did not infringe defendants' rights, and even after consideration of the trial court's errors, there remains sufficient competent, relevant and reasonably credible evidence to support the court's factual

findings and legal conclusions. See Cesare v. Cesare, 154 N.J. 394, 412 (1998). Accordingly, we affirm both orders.

As this is the second FN/FD action involving this family, some background is useful to put the current appeals in context. Alice previously lived in Virginia with her former husband, M.C. (Matt) and their four children. Both their families live there too. After the couple split up, Alice met Malcolm online, and they moved to New Jersey in 2012 with Alice and Matt's three younger children. Alice's oldest child remained with her father.

After moving to New Jersey, Alice and Malcolm had three children, M.G.H. Jr. (Mickey), I.H. (Irene) and Henry. Irene was born in February 2017 during the first FN/FD actions and Henry was born in January 2018, weeks after those actions ended. The Division received sixteen child protective services referrals about the family between 2012 and 2016, eight relating to domestic violence between Malcolm and Alice, four of which were "established," and one of which, as to Malcolm, was "substantiated." The other eight referrals related to educational neglect, housing instability and Malcolm's alleged substance abuse.

The first FN/FD actions were sparked in November 2016, after Alice's three daughters living with the couple reported witnessing several incidents of

domestic violence between Malcolm and Alice. The Division responded by implementing a safety protection plan barring Malcolm from the family's home. The following month, the Division obtained custody of Alice's three daughters and Mickey after Malcolm allegedly returned home in violation of the plan, with Alice's acquiescence, and engaged in new acts of domestic violence, resulting in Alice having to go to the hospital for treatment. Two months later, in February 2017, the Division obtained custody of Irene, Malcolm and Alice's second child, shortly after her birth. The children were placed in three separate resource homes with Alice and Malcolm permitted supervised visitation only. Dahlia petitioned for custody of all five children.[3]

---

[3] Matt and his mother also applied for custody of Matt's children. Matt eventually withdrew his application based on his inability to care for all of the siblings and his mother deferred to Dahlia, remarking "My whole design and purpose is for the safety and the welfare of my grandkids. If it's me or if it's that grandmother [Dahlia], that's all that matters to me is their safety." Dahlia echoed her sentiments, objecting to the children returning to Malcolm's care because he is "a dangerous individual," "unpredictable," and she believed he was "orchestrating most of what's going on here one way or the other." She told the court, "I can't explain what my daughter is doing. I don't know why she's engaged in this relationship. That is her problem. My concern is with the children." Alice and Matt's oldest child, who was over eighteen and not a party to the proceedings, testified how close all the siblings were and how difficult it was for her sisters and Mickey to be separated by living in different resource homes while trying to cope with the tumult in their lives caused by Malcolm's domestic violence. Both Matt and his mother remained involved through the several hearings in the prior FN/FD proceedings, supporting Dahlia's bid for custody.

The court heard both the FN and FD matters together. Neither Alice nor Malcolm, both of whom were represented by counsel assigned by the Public Defender's Office of Parental Representation, objected.

During those first proceedings, the two oldest of Alice's three daughters who lived with the couple testified to seeing Malcolm yell, throw things and swing at their mother when he was angry with her, once hitting her in the head with a broom, requiring stitches. They claimed Malcolm also yelled at them on occasion, that they were afraid of him, and they feared for their mother. They also testified Malcolm violated the Division's safety plan with their mother's knowledge and acquiescence. Their law guardian expressed her understanding that the first FN action was only a Title 30 protective services proceeding against their mother, "which is what [her] clients want[ed]," but argued that as to Malcom, the Division had established abuse and neglect.

At the disposition hearing in the first FN proceeding, the Division's permanency worker testified Alice had undergone a psychological evaluation resulting in the psychologist recommending therapy and domestic violence counseling. The worker testified Alice had completed domestic violence counseling and claimed she was engaged in her own therapy with a private

10

therapist and attending couples counseling with Malcolm, but the worker had been unable to verify either.

As for Malcolm, the worker testified he had completed a batterer's intervention program, but like Alice, claimed he was seeing a private therapist for individual therapy and couples' counseling, as well as seeing a psychiatrist, none of which the worker had been able to verify. The worker explained the couples' counselor to whom the Division had referred Malcolm and Alice, stopped seeing them "because [Malcolm] was becoming more irate during sessions and [she] had fear for her own safety."

The worker further testified Malcolm had not engaged in substance abuse treatment or a partial care program, both of which had been recommended by the Division's psychologist. According to the worker, Malcolm was discharged by RENU (Revitalizing Environments through Nurturing Unity), the service providing supervised visitation with the couple's children, for his failure to enroll in a partial care program, resulting in visitation being supervised by the Division at its office. The worker testified Malcolm and Alice did not attend consistently, Alice's daughters were not comfortable interacting with Malcolm during visits, and Malcolm interacted only with his biological children, Mickey and Irene.

11

The law guardian for Alice and Matt's two younger daughters,[4] told the court "[b]oth girls love their mom. They're afraid to be around [Malcolm]." Alice testified she knew "what . . . domestic abuse is. I understand that. I've gone to your classes and I've dealt with it before" while married to Matt. She claimed she and Malcolm "have had our disagreements. We've had arguments. We've made mistakes. We've done things." She also claimed they were "looking for help" and had been asking the Division "for assistance with counseling" since 2014. Alice testified the couple had been denied services in the past, and that "this is not something that we were trying to avoid, not something that we were trying to negate. We were trying to fix things."

Dahlia testified she sought custody of her grandchildren only after they were removed from Alice and Malcolm and placed in foster care. She testified she and her husband were "not trying to take the kids away from anybody" but were "just trying to help the situation and give [the children] some stability." Alice opposed the children going to her mother, claiming her parents kept guns in their home and her father was an alcoholic.

---

[4] By the time of the first disposition hearing, Alice's second oldest daughter had turned eighteen and had gone to live with her father in Virginia.

The Division instituted an assessment of Dahlia's home in Virginia through the Interstate Compact on the Placement of Children. In the transcript from the fact-finding hearing, the deputy representing the Division advised the court that the Virginia child welfare authorities denied Dahlia's application because she and her husband had taken in an ex-felon after his release from jail. Dahlia told the court she and her husband had alerted the child welfare authorities to the man's presence in their home to ensure it wouldn't be an impediment to their obtaining custody of their grandchildren. She informed the court that the Virginia authorities had advised his presence was a problem, the man had moved out, and the Division was awaiting a response on her resubmitted request for approval.

When the court expressed concern over the delay, the deputy advised that the Virginia authorities had no objection beyond the unrelated individual in Dahlia's home. He also advised that Dahlia and her husband were not looking for the financial assistance placement would provide and had re-filed their FD application for custody of all the children. The law guardians for the children supported the children's placement with Dahlia, and if that could not be accomplished quickly, were in favor of her obtaining custody under the FD docket in light of the rapidly approaching start of the new school year. The

13

law guardians noted Dahlia and her husband had undertaken the parent training required, she maintained regular contact with the resource parents, the children were supportive, and Dahlia visited regularly, sometimes taking all the children, but the baby, overnight during her weekend stays.

While making clear to Alice and Malcolm that the case was not a termination case, the judge noted the FN case had been open for nine months, that Alice and Matt's two youngest daughters as well as Mickey and Irene were in the Division's custody in three different foster homes and that both Alice and Malcolm's time with the children remained supervised because neither had completed their recommended services. The judge found neither parent was in a position to resume custody of any of the children and awarded custody to Dahlia in the FD action, contingent on the Division visiting her home in Virginia and confirming the only obstacle to interstate placement, the presence of the ex-felon, had been remediated by his departure. The judge also ordered Dahlia to work with the Division to ensure the children were enrolled in appropriate programs in Virginia, including the continuation of the trauma-focused therapy they had been attending in New Jersey.

Finally, the judge ordered the Division to leave the FN case open so defendants' attorneys could ensure a parenting time arrangement. While

14

rejecting defendants' arguments that moving the children to Virginia would work an effective termination of their parental rights, the judge acknowledged "if parenting time is not worked out with reasonable opportunities for these parents to see their children, then essentially it becomes a much more difficult relationship to maintain," making it "much more difficult for [Malcolm and Alice] to be able to complete their services and perhaps apply to the courts to regain custody of their children." The judge ordered the Division to keep the FN file open for at least another ninety days to permit Alice and Malcolm the opportunity "to continue on with those services so that that they may be in a position to look to have custody back for these children." Alice was to complete individual counseling. Malcolm was to likewise complete individual counseling and attend a partial care program.

The judge set a date four months out to review compliance with his orders. Neither Malcom nor Alice apparently appeared in court on that date. The Division reported neither had complied with the court-ordered services, and that both were missing and not in contact with the Division. The judge terminated the FN case on December 20, 2017. Neither Alice nor Malcolm appealed from the judge's orders in the first FN and FD actions.

A-4052-18

The Division a month later effected an emergency removal of Henry on his discharge from the hospital on January 19, 2018. On the return date four days later before the same judge as in the first FN/FD actions, Alice advised the court that a Dr. Soule at Glassboro Anchor of Hope Counseling had been providing both her and Malcolm individual and couples' counseling since December 18, 2017, and that she had enrolled in the Robin's Nest Healthy Families Program in December 2017, following the couple's recent move to Glassboro. She also testified Malcolm had recently obtained a home health aide for his multiple medical conditions, including a prior gunshot wound, his degenerative spine, diverticulitis, irritable bowel syndrome, a heart valve issue, arthritis in his knees, bilateral carpel tunnel syndrome, his severe, uncontrolled diabetes, as well as his P.T.S.D. and bi-polar condition.

Malcolm testified he had completed all the services he had been previously ordered to complete, but for the partial care program. He claimed he had been advised by the Division that partial care would not be necessary if he obtained a medical marijuana card, which he had done. He testified he and Alice had "slipped," for which he, "as the male of the family," took responsibility. He explained he was "trying [his] best" and hoped the Division could understand he "just want[ed] [his] kids back."

16

The judge noted the prior FN matter had just closed the month before, after having been open for over a year, with neither Alice nor Malcolm having completed services and their visitation remaining supervised. The judge stated he took Alice and Malcolm at their word that they had since enrolled or completed the previously ordered services but that "verification [was] necessary." He granted the Division temporary custody of Henry, ordering the return date extended until counsel could be appointed.[5]

In the interim, the judge ordered the caseworker to meet with Alice and Malcolm the following day and entered a self-executing order that Henry be returned to them if the Division confirmed at that meeting or thereafter that defendants had completed their services. The judge ordered the Division to provide Alice and Malcolm supervised visitation with Henry and ordered Alice to submit to a psychological evaluation and participate in domestic violence services. Malcolm was ordered to attend services to address mental health and substance abuse concerns, and to comply with previous recommendations. Both Alice and Malcolm were each required to complete individual psychotherapy. Three weeks later, Dahlia, self-represented as she has been

_____

[5] Alice's former attorney from the Office of Parental Representation was in court on the return date, but advised he could no longer represent her based on irreconcilable differences that had arisen between them.

throughout, filed a request to intervene in the newly filed FN action and for custody of Henry.

On the rescheduled return date, the Division caseworker testified that Alice was on a waitlist for individual therapy with Robin's Nest and had a few days previous attended her psychological evaluation, for which the Division was awaiting a report. The caseworker understood that SERV (Social/ Educational/Residential/Vocational Behavioral Health System, Inc.) was to have contacted Alice about starting domestic violence services, but did not know if the contact had been made.

As for Malcom, he was not participating in any services, claiming his health problems confined him to his home and made him unable to complete services. The worker testified that although Malcolm had completed a batterer's intervention program in early 2017, there had been at least three domestic violence incidents requiring police intervention since then, including one from November 2017, when police were called to a Dunkin Donuts because Malcolm was verbally accosting Alice. Malcolm had videoed the encounter on his cellphone and posted it to social media, which the worker had viewed in addition to reviewing the police reports. The worker testified he did not know whether Malcom was taking medication beyond medical marijuana

18

for his PTSD, but advised the partial care program was designed in part to address that issue.

Dahlia advised the court that she understood Henry was in foster care, and the Division was undertaking efforts to reunify him with his parents, but wished the court to know that she and her husband were willing to assume his care either then or at any point in the future. The court noted that although Dahlia had sought to intervene and seek custody of Henry in the FN case, she had not filed a new FD application. The judge confirmed his recollection with the deputy that the Division had visited Dahlia's home in Virginia before custody of the other children had been transferred to her and was satisfied it was suitable for the children. The deputy confirmed the Division had been down to Virginia to inspect Dahlia's home, and was satisfied the children were safe with her and her husband.

Neither Alice nor Malcolm opposed Dahlia's intervention in the FN proceeding but both objected to the Division placing Henry with her in Virginia, which would make it practically impossible for them to develop a bond with him. Malcolm's counsel also objected to the lack of notice of Dahlia's application for custody, stating he was not aware of whether an FD custody application had even been filed.

A-4052-18

The judge granted Dahlia's motion to intervene in the FN case, but dismissed her application for custody without prejudice, finding that Alice and Malcolm needed to maximize their visitation with Henry so as to allow for reunification. As Dahlia had brought the older children with her to New Jersey, and Malcolm and Alice had a scheduled visit with Henry for later that afternoon, the judge ordered an extended visit between them and all of the children. Dahlia formally filed an FD application for custody of Henry shortly thereafter.

At the preliminary fact-finding hearing two-and-a-half-months later, the Division's permanency worker testified in support of the Division's section 12 case that this was a family in need of services. The worker testified the Division's psychologist had recommended Alice participate in specialized therapy for victims of domestic violence, and that she and Malcolm not engage in couples' counseling, at least not until both had undergone individual therapy and couples' counseling was recommended by both their individual therapists. He also recommended that Alice undergo a parental capacity evaluation after she had completed a significant portion of her recommended services. The worker testified that Alice had attended her first appointment for her domestic violence therapy, but the provider needed a signed release on the provider's

form before it would release any further information to the Division, which Alice had not yet provided.

The Division did not have a report from Malcolm's most recent psychological evaluation, but he had yet to participate in the partial care program he was ordered to attend in the prior FN action. Malcolm contended he could not physically attend the program but he was unable to produce medical documentation to support his position. His doctors advised only that he had mobility issues — he was then in a wheelchair — and might need some "ability assistance" to attend. The worker testified Malcolm was eligible for specialized transport to either of the two hospital-based partial care programs the Division had identified that could accommodate a patient in a wheelchair. The worker testified Malcolm was getting individualized therapy at home from a Dr. Goldberg, who had been recommended to him by his nursing care provider, not the Division. The worker also reported two recent domestic violence incidents requiring police intervention, although neither involved physical violence.

In making his findings, the judge noted those two incidents, stating he found them "troubling," in light of "the long history of domestic violence in this case." He further noted Malcolm's failure to attend an intake appointment

at one of the hospital-based partial care programs to learn whether his physical problems could be accommodated. The judge found that problematic — in the absence of direction from Malcolm's doctors that he was unable to participate — as Malcolm's failure to engage in services would likely be a serious impediment to reunification. In response to Alice's counsel's request that her parental capacity evaluation be completed sooner to assess whether she was ready for reunification, the judge noted that Alice had

> in the past [been] ready for reunification except for the fact that there remains, and I'm not looking to break families up, it's not the role of this court. But because [Malcolm] had not addressed services that needed to be addressed and because there's still ongoing concerns about domestic violence, marital discontent, whatever you want to call it, that erupts into a situation where police have to be called, yes, she's been ready and has been ready for some time but for the fact that this is a family that involves both a mother and a father and they want to be together, and that's their right to be together, but I can't have reunification with one without the other if that's their position.

The judge concluded the Division had established the family was in need of services under Title 30. Because Dahlia again had the older children with her, the judge ordered the parties to work to schedule a visit between them and Alice and Malcolm. Dahlia noted that while the children had been able to visit with them at the Division office after the last hearing, they had also scheduled

22

a second visit for Saturday evening with a supervisor arranged, but Alice and Malcolm "did not show up." Because one of the girls was scheduled to attend a ceremony that evening in advance of her high school graduation, Dahlia asked that the visit occur as soon as possible.

At the next compliance hearing four months later, the Division worker testified that Alice was compliant with her domestic violence counseling and consistently attending. The worker testified Alice would be referred to individual counseling after she'd met her goals in the domestic violence therapy. Because Malcolm had made several allegations to the Division that Alice was abusing drugs, the Division requested she undergo urine screens and a hair follicle test, to be followed by a substance abuse evaluation if those tests were positive.

The worker testified that Alice and Malcolm had three visits with Henry each week in their home, two of which were supervised by the Division, and one by RENU. The worker explained that Human Services police were present for the Division visits as a result of Malcolm's past aggressive behavior toward the prior worker. According to the worker, the Division ordinarily does not permit parents joint visitation when there are issues of domestic violence. Because Alice and Malcolm expressly desired to visit together, however, and

the Division could not send two workers for two, two hour visits each week, the Division sent along Human Services officers to ensure no worker was in the home alone.

As for Malcolm, the Division had referred him to a provider, Robin's Nest, that could offer him individual counseling, batterers' intervention therapy, as well as anger management and parenting skills in the couple's home. Although the referral had been made a month earlier, Malcolm had only completed his intake appointment a few days before the hearing. He had objected to the six hours a week the provider required to perform those in-home services.[6] The worker also testified Dr. Goldberg, the therapist who had been seeing Malcolm, discontinued her sessions because she found Malcom difficult to engage, eating, falling asleep or playing on his phone during sessions, and that Alice's presence was distracting. She also advised that Malcolm's needs were outside her area of expertise, which was elder and hospice care.

---

[6] Malcolm likened his weekly "six hours of visit[s] and six hours of counseling" to holding down a part-time job, which was beyond his physical capabilities.

A-4052-18

On cross-examination, Malcolm's counsel asked the worker why the Division was requiring Malcolm to engage in therapy already being provided him by Dr. Nedock, and Sally French. The worker replied she had not been able to obtain signed releases from Malcolm to learn what services those two persons were providing.[7] The worker further testified that neither Alice nor Malcolm would sign releases for an incident over the summer when Malcolm called the New Jersey Abuse Hotline to report that Alice had been hospitalized, and Malcolm had been taken by police to the crisis unit at Jefferson for evaluation on the same date.

Malcolm's counsel objected to any reliance by the court on Malcolm being taken for a crisis evaluation, claiming Malcolm, and perhaps Alice, disputed whether the circumstances justified a crisis intervention. Counsel advised the court there was video of the incident, which he had not reviewed, making discussion of the issue not appropriate for the hearing. The judge responded by explaining to counsel that he'd had

> to make some difficult decisions in this case, most of them centered on [his] concern for the activities and the actions of your client and [Alice], and this case has been going on for a considerable period of time.

---

[7] The worker also explained the Division was "looking for services that are comparable to the evidence-based programs that are provided in out-of-home services," which is why the Division had recommended Robin's Nest.

There seems to be at least some direction now for both of these parties, [Alice] perhaps more than [Malcolm], but both of these parties working and the Division making services available to them. I think under the circumstances so far, having to use means perhaps that are a bit different than other cases, but nonetheless, I would've ordered that they do these things and they've done them before I even ordered them. That's particularly the in-home services for [Malcolm] to give him that opportunity [to complete services], but when I hear about two intervening hospitalizations for . . . your client and [Alice], I just — it's something this court's going to be obviously concerned with, the circumstances surrounding and whether or not appropriate treatment's being provided because this — the goal of this court is still to attempt reunification, but I have a . . . one year old in this case and I have to make certain that that one year old is going to be properly cared for and if there's an issue about crisis and an issue about [Malcolm] making the call, advising the Division that [Alice] is in the hospital and then not receiving any information, these are concerns, but [counsel], I'll leave it at that for now.

As the court turned to disposition, Malcolm, against his counsel's advice, made a statement to the court, under oath, explaining the circumstances of his being taken for a crisis evaluation. Malcolm claimed the permanency worker testifying at the hearing had directed that he be "forcefully taken away from [his] home" and once he was removed, "had a male that was interested in [Alice] directed towards [Alice and Malcolm's] home." Malcolm claimed the

26

worker denied it but "upon speaking with people at D.Y.F.S., [he] found out that she was directly involved."

Malcolm asserted the permanency worker sent a therapist to Malcolm's home when he "already . . . had a doctor for three years doing therapy," which, he explained, was why he delayed engaging with Robin's Nest. He claimed he had never told the worker he "was no longer using Dr. Nedock or Ms. French," and instead "advised [the worker] that [he] would be committing fraud because [he's] on social security. . . . [t]o have two doctors of the same field doing things for me." Malcolm claimed he

> almost suffered a near heart attack after being forcefully, as I recall and as I reported, forcefully removed from my home without any incident. I was going out to breakfast and I was approached and I am a diabetic. I advised I needed to get my wheelchair out of my driveway and go get something to eat and when I went to press charges against the person that approached me at my home for harassment and trespassing, as well as asking politely to remove himself from property, he blocked my driveway disallowing me from being able to leave my home and then he followed —

When the judge asked Malcolm whom he was talking about, and who had forcefully removed him from his home, Malcolm replied:

> This therapist because I told him that I was pressing charges for trespassing and all. So, even though, I told them on recording and I recorded it, every bit,

stating that I needed no help nor did I want any, I have to go get something to eat, please remove yourself from my home. That's how I put. He refused. When I —

The judge broke in, leading to the following exchange.

The court:   So, he took you some place?

Malcolm:   Yes. They took me from my home.

The court:   Where did —

Malcolm:   They snatched me out of my wheelchair. The police put me — he gave a paper that stated from D.Y.F.S. that I was erratic — irrational — delusional and, you know, aloof. So, I told him I don't have time for this. Okay? I have to eat, I have to get out of here and take my medicine. Upon trying to leave, he blocked my way, as well as I almost had a heart attack. I was —

The court:   Were the police — were the police there, Mr. []?

Malcolm:   Yes, sir.

The court:   Okay.

Malcolm:   And I was taken away in an ambulance. Not a police car, but an ambulance because as reported, I did what the sergeant told me. Upon doing what the sergeant told me, I started having fibrillations in my [heart] valve, which I've had a problem with. I take

28

medication for, which [the worker] is aware of my heart problems, which my primary care physician, Dr. Juan Utreras, prior to this incident, told her that — sent her a notification letter that I am disabled and she's aware that I have health issues and these health issues are well-documented in her file. She proceeded to still do something that almost cost me my life and because of that, you know, there's been some, you know, cautionary scenarios that I've had to take in approaching [the worker] for her negligence to my health along with almost having that heart attack, I —

The court: Are you talking about the incident that occurred on July 12th?

Malcolm: Yes, sir. That's —

The court: Okay. That's — and I — and I did ask [the worker] regarding that and it indicates in her court report — and Mr. [] I take what you're saying very seriously, but I also caution you, I may not be in a position to be able to act on your allegations, but perhaps Mr. [], your defense attorney here in this matter, might not necessarily be able to carry through, but he might be able to give you some guidance as to where you might go, but this action was done by — with the supervision from — according to the court report by police. So, they supervised and they took the action. No one else took you from your home.

29

Malcolm:     No, sir.  She showed me — the doctor
             showed me the documentation signed by
             [the worker] —

The court:   Okay.

Malcolm:     — Ms. Stephanie []  I can barely
             remember her last name most of the time
             —

The court:   Okay.

Malcolm:     — but I remember at that point.
             Stephanie [] was her last name, to which
             maybe allowed me to know that she was
             involved in this.  So —

In his statement to the court, Malcolm also claimed the worker had

refused to accept four prior letters from Dr. Utreras, that were "as clear . . . as

. . . could be" in attesting to Malcolm's disability, resulting in his being

"hospitalized 20 times over the last year."[8]  He claimed he might "lose [his]

---

[8]  At the last hearing, Malcolm's counsel had addressed those letters, stating
Malcolm had

> provided by [counsel's] count . . . four letters from his
> doctors . . . at this point indicating at least in his mind,
> and I — I understand where he's coming from,
> although I understand also why the Division isn't
> getting the message that he's suffering from a number
> of severe physical problems that make it extremely
> almost impossible for him to get around as much as

30

feet because of having to keep running out" at the worker's direction to come to the Division's office, "which is, like, a half hour ride, miles away" from his home. Malcolm claimed he was "supposed to be bedridden and homebound" but because of the worker's "neglect and negligence," he suffered "severe injuries to [his] feet, possibly permanently damaging them from being able to walk correctly."

When the judge asked whether there was anything else Malcolm wanted to tell the court, Malcolm claimed Dr. Goldberg told him and Alice that she hadn't quit because of Malcolm "playing on [his] phone" as the worker had testified. Instead, he claimed the therapist told them she quit because of the "constant and repetitive harassment from [the worker] to write out something disparaging about [Malcolm] so that she can pursue a case." Malcolm also claimed the worker had approached Alice, saying "if she really

_____

the Division would like him to in order to participate in his day program.

Counsel conceded "[t]he problem here is . . . I've got four letters here that just don't come out and say [Malcolm] should not be leaving the house," and that he had explained to Malcolm they needed "his doctor to explain exactly if his doctor feels that he cannot attend or is putting him in some danger of attending a partial care program. We need to have the doctor come out, right out, and say it."

31

wants to see her children, then she needs to work with [the worker] to get evidence for her case" against Malcolm.

After the judge explained that it was he and not the Division that had removed Malcolm's children and had now ordered the Division to provide him services so he could put his "family back together again," Malcolm offered the following:

> Excuse me? [The worker], as well as [the last worker] put my family members, as well as myself and [Alice] under duress in order to acquire the information or scenarios that they did in order to separate our family. All that I'm voicing this opinion for is to show that the negativity that [the worker] is speaking of, my caseworker, is not from agitation, aggravation, or a mental issue on my part sir. These are founded and these provable, very tangible evidence with witnesses that [the worker] has done things to cause irritation in my life or our relationship that she then exploits to her advantage to prove a case that is actually only still ongoing for two, three years because she's pursuing — she's pursuing this case so vibrantly only because she doesn't like the people involved. That's all that I'm saying — and I have definite tangible proof of that as well as witnesses that will attest to this.

On cross-examination by the deputy, Malcolm claimed his doctors at Cooper Hospital were managing his medication, and providing him individual therapy, anger management and domestic violence counseling and had been doing so for the last "[t]hree or four years," and he was willing to sign a

32

release for Cooper to permit the Division to confirm it. Following that testimony, Malcolm's counsel summed up by saying the court was "in a holding pattern regarding [Malcolm's] situation," and that once the release for the Cooper records was signed "we'll find out whether he's been doing everything that he's been saying he's been doing and that the Division has been asking him to do all along or not. It boils right down to that." Counsel argued "for all we know at this point, [Malcolm] may well indeed be compliant with services. We're just going to have to wait to find what the records actually reveal."

The deputy closed by stating the Division had been trying to get the parties to comply with services for over two-and-a-half years, going back to the first case, and this was the first the Division had understood that Malcolm was asserting his Cooper doctors were providing all of his court-ordered services and had been doing so for at least the last three years. The deputy underscored the new case involving Henry had been open for nine months already, meaning the Division would have to offer a permanency plan at the next hearing. The deputy noted that plan would likely be for Henry to join his siblings in the absence of proof that defendants, particularly Malcolm, were complying with services.

Turning to the FD matter, Dahlia again explained she was not familiar with all the proceedings but had filed her application for custody, because she did not want Henry to be put up for adoption, preferring instead that he be raised alongside his siblings and extended family. Noting that she and Henry's siblings visited him when she attended court in New Jersey and video conferenced with the resource family and Henry when in Virginia, Dahlia asked the court to consider placing Henry with her during the pendency of the matter.

The judge reopened the hearing to allow counsel to question the worker about visitation with the children already in Dahlia's care. She testified the Division had, per the court's direction, arranged for Alice and Malcolm to visit with the children at a mall the last time everyone was in court. Dahlia and the children were there at the appointed time, as well as the Division supervisor, but Alice and Malcolm again did not show. The worker testified she telephoned Alice and offered to arrange for transportation for everyone to the library for a visit, but defendants declined. The children, after waiting for two hours, had ice cream at the mall and returned to Virginia. The worker testified the Division had repeatedly offered to assist Alice and Malcolm with the costs of transportation to Virginia to visit the children if defendants could identify a

34

supervisor there, only to be advised they did not have anyone to supervise their visits.

Alice addressed the court about being cut off from any visits with the children in Virginia, saying she and Malcolm "can't even talk to them on the phone properly. We can't get pictures, we can't find out any information on school or anything that's going on with our children at all." The court asked what she meant by saying she could not "properly" speak to the children by phone, and why she and Malcolm had not availed themselves of the opportunity to see the children the last time everyone was in court. While acknowledging Alice's assertion "that other people aren't taking the steps necessary for [her] to have visits," the judge observed she and Malcolm did not appear to be "taking very many steps to have visits either, whether it was at the library, at the mall, or making any attempts to find a potential supervisor to be able to supervise the visits in Virginia."

Before permitting Alice to respond, the judge turned to Dahlia, who corroborated the worker's account, and added that her granddaughter had been willing to give up attending her graduation-related ceremony for the opportunity to see her mother, who did not show up, leaving all the children distressed. Dahlia suggested the judge ask Alice when "the last time [was] that

she wrote the children, sent them a card, or when she's called to talk with them?" Dahlia claimed Alice had "barely spoken" to her thirteen-year-old daughter sitting in the hallway "or showed her any affection, a peck on the head, or whispering to her, I love you, because she's afraid to say anything apparently in front of [Malcolm]."

When the judge turned to Alice to respond, she claimed she and Malcolm missed the visit at the mall because

> we were told at the very last minute that we would not be able to have that visit by our worker because there wasn't going to be a supervisor from the Division for all of our children so that we can be there with them. That's what we were told by the worker. That was a miscommunication. They didn't — she didn't contact us properly at all. So, that's why we missed that.

She did not respond to the worker's testimony about offering to transport them to the library to see the children. Alice claimed it was not their fault her daughter missed her ceremony, and that the Division had repeatedly refused to assist with any visitation with the older children because it was an FD matter outside its jurisdiction. She did not respond to Dahlia's questions about writing or phoning the children.

The judge again denied Dahlia's request for immediate custody of Henry, explaining it was important to permit Alice and Malcolm to visit Henry

frequently while completing their services, which her home in Virginia made impossible. He further suggested that Alice file an application in the FD matter if she needed assistance in arranging visitation with her children in Virginia.

The permanency hearing scheduled for January 17, 2019, Henry's first birthday, was adjourned on consent of all counsel after the Division notified the court and counsel only days before that it had determined reunification was not feasible, and it would pursue termination of Alice and Malcolm's parental rights followed by adoption. The court took limited testimony from a new permanency worker[9] about the status of the case and questioned Dahlia about visitation. Malcolm also made a statement under oath.

The new permanency worker reported that Alice's hair follicle test was negative and that she'd missed two months of domestic violence counseling, owing partly to a recent miscarriage and the counselor being away over the holidays. Malcolm was continuing to receive all of his services, individual

---

[9] Following Malcolm's statements about the former permanency worker at the last hearing, the Division made an "administrative decision" to move the case to a new office. Asked by the court if he knew why the change was made, the new worker testified the case was "red-flagged" for safety concerns because of the difficulties the former office had "engaging with [Malcolm]. He was very hostile."

counseling, batterer's intervention and anger management, at his home through Robin's Nest.  The worker reported that Alice was also receiving some counseling through Robin's Nest.

When asked on cross-examination by the law guardian about the services Alice was receiving in the couple's home through Robin's Nest, the worker replied "there's something going on with the — the dynamics of this case and it is that [Alice] and [Malcolm] has (sic) stipulated to the Division that they do everything together and that, you know . . . they are doing everything together."   Asked whether the Division would be willing to arrange for Alice's "counseling outside of the home maybe away from [Malcolm,]" the worker answered, "[t]hat's one of the barriers that we've been having in this particular case."

The worker reported that Malcolm, after accepting the Division's offer to have his psychological evaluation performed at Cooper, instead of with the Division's expert, did not arrange to see a psychologist or psychiatrist but arranged to meet with Dr. Utreras, his internist.  When asked by Malcolm's counsel why Dr. Utreras could not perform Malcolm's psychological exam, the worker explained that Malcolm had advised his psychologist was Sally French, not Dr. Utreras.

A-4052-18

The worker also testified RENU had ten days earlier ceased supervising the couple's visitation with Henry because of Malcolm's increasingly aggressive and threatening conduct toward staff, culminating in the police having to be called to the couple's last visit. RENU thereafter discharged the couple and refused to provide them any further services. After that visit, which was also attended by the permanency worker, the Division determined it was no longer willing to provide the couple visitation in their home. All further visits would be conducted at the Division's office with Human Services officers in attendance.

The judge asked Dahlia about visitation. She explained she and some of Henry's siblings video conferenced every week with Henry and his resource parent, and she visited at their home when she was in New Jersey. Asked by the judge whether visitation was taking place between the older children and Alice and Malcolm, Dahlia testified that neither parent had reached out to her to arrange visitation in Virginia, and there had "been no cards or correspondence or any kind of interactions between them and the children." When the judge asked whether there'd been any attempt at video conferencing, Dahlia explained there had been no communication at all — and that "[Alice]

39

doesn't have a phone that we know of. The only communication is through [Malcolm] and that hasn't always worked."

Malcolm responded by saying: "Most of that was a lie. I have not been contacted about visits. I have seen [Mickey] once in the past year and there's no communication." Malcolm claimed he had both a landline and a cell phone and that "[Alice] has made a woman's choice, she's a grown woman. I don't stop her from doing anything." He said that he would welcome time with his children, but he was sick. He claimed he was "doing what a father is supposed to, but [he] asked for everyone to have a hair strand test. They only tested [Alice]. If Ms. [Dahlia] has some tested, I'm pretty sure she's going to come up with a few things that she's been into. That's the reason she comes to . . . Jersey." After Malcolm claimed that Dahlia wouldn't give him her phone number "because she wants to give the impression that there's a problem, but there isn't," Dahlia provided her phone number on the record for inclusion in the court's order. The court again found the family in need of services under Title 30.

The court conducted a combined permanency/disposition and FD custody hearing on March 12, 2019, where the Division presented its concurrent plans for termination of parental rights followed either by Henry's

adoption or transfer of custody to Dahlia; and the court considered Dahlia's FD application.[10] The Division presented the testimony of the first permanency worker who recounted the difficulties the Division had in providing services to Alice and Malcolm based on their general refusal to attend services without the other. The worker explained that Alice, who had qualified to become Malcolm's home health aide through Medicaid and was paid for providing him care thirty-five hours a week, refused to attend appointments without Malcolm, notwithstanding the Division's understanding that she could request respite care if she were concerned about leaving him alone. The worker testified that Alice refused to complete her psychological evaluation because Malcolm, who had accompanied her to the appointment, complained his blood sugar levels were dropping after two hours and he needed to go home. The Division offered to provide her separate transportation, but she insisted on leaving with Malcolm, even though there was no need for him to have come in the first place.

---

[10] The court also heard two FD applications by Alice; one to regain custody of her and Matt's youngest daughter from Dahlia and the other to transfer custody of Henry from the Division back to her. The judge denied both applications. Alice has not appealed from those orders.

A-4052-18

The worker testified that despite Malcolm having completed a batterer's intervention program in 2017, the Division determined he needed to reengage in another program based on the recommendation received from the psychologist conducting his 2018 psychological evaluation and the continued reports of ongoing domestic violence, leading the Division to conclude he'd been unable to apply the concepts from the first program. The worker testified the Division received numerous reports of Alice leaving the couple's home and Malcolm following her, leading to public disputes and the police being called by employees of the places where Alice had taken refuge.

Because Malcolm now refused to attend services outside his home, the Division was never successful in re-enrolling him in an effective anti-violence program. The new worker testified the Division attempted to provide those services to Malcolm through Robin's Nest, but were not successful because Alice insisted on being present for Malcolm's sessions, leading Robin's Nest to inform the Division it was not able to provide the level of domestic violence counseling the couple needed. SERV, the service providing Alice with domestic violence counseling, had also recently advised the Division it could not meet the level of care Alice needed.

42

The worker also recounted the circumstances leading to RENU to close out visitation services to the couple. In its discharge summary, entered in evidence without objection, RENU detailed the couple's frequent request for unsupervised parenting time and its continued advice that they needed to comply with court ordered services before supervision could be lifted. The summary noted Alice and Malcolm were warned Malcolm's "disruptive and inappropriate" behavior during visits would not continue to be tolerated. Following the police having to be called at the couple's last visit and "the family's lack of progress with the RENU program and their court ordered services," RENU closed the case effective January 7, 2019. The worker also reported Alice and Malcolm had not seen Henry since, as they had not attended any of the visits scheduled at the Division's office, notwithstanding that the worker had arranged for transportation for each visit.

Over Alice and Malcolm's objection, the court admitted their most recent psychological evaluations into evidence. Notable from Alice's evaluation was the psychologist's report of several incidents of domestic violence drawn from the Division's contact sheets, including one from June 2017 when Alice went to the hospital for a head injury and reported she had been struck by an unknown assailant, and another from October 2017 when Alice appeared in the

43

Emergency Room with choke marks on her neck and a hematoma on her head, claiming she'd tripped. The psychologist also noted police reports from November 2017 when police were dispatched to a Dunkin Donuts because of an argument between Alice and Malcolm; December 2018 when police responded to a laundromat where Alice had locked herself in the bathroom due to an argument with Malcolm; and February 2018, when Malcolm had loudly accused Alice of cheating on him at a tire store.

The psychologist concluded Alice was a thirty-nine-year-old woman of average intelligence with no obvious psychological disorders. Although admitting that Malcolm had "a bad temper," and could be physically aggressive toward objects, Alice denied he had ever attempted to physically harm her despite reportedly going to the Emergency Room more than ten times in 2017 with injuries not consistent with her explanations. Indeed, Alice denied any domestic violence between her and Malcolm. The psychologist concluded that Alice, while denying she was the victim of domestic violence, "demonstrated behavioral characteristics often associated with being the victim of domestic violence."

The psychologist further noted that Alice had remained in a relationship with Malcolm "despite the removal of her children and inability to be reunified

44

with them due to continuing the relationship" even after he "was found to be a danger to her children due to his aggressive behaviors." The psychologist further noted Malcolm had "demonstrated behavioral signs of a batterer including becoming defensive, aggressive, and angry when questioned, answering questions for [Alice], setting up communication barriers between [Alice] and possible helpers" and appearing to control her behavior while exhibiting antisocial behaviors himself.

As an example of the latter point, the psychologist noted Alice chose not to complete her psychological evaluation, insisting on leaving when Malcolm's transport appeared, which they'd scheduled to arrive an hour-and-a-half before the evaluation was scheduled to end. Alice left before she could complete her interview or self-report measures. The psychologist reported Alice was offered transportation home so she could remain to finish the evaluation, but she declined. Alice also declined the suggestion she stay another half hour to complete the interview and return another day with her caseworker to finish the self-report portion. Finally, Alice refused to continue with the evaluation even after her transportation home was delayed when Malcolm got verbally aggressive after being advised Division staff would drive Alice home so she could complete her evaluation. After Malcolm sent the transport away so he

could remain with Alice, she didn't ask to complete any more of her evaluation despite having to wait for someone else to take them home.

Based on her review of the family's Division records and the evaluation she performed, the psychologist concluded Alice "failed to prioritize her children's safety and stability over her relationship" with Malcolm and was "not able to meet her children's physical and emotional needs due to her continued involvement" with him. She recommended against reunification and deemed the prognosis for change in the near term dim, noting Alice's failure to maintain regular contact with her older children, the barriers Malcolm erected for her engaging in services and her own reluctance to participate.

Malcolm never completed the updated psychological evaluation the judge ordered in this case. Despite having advised the court under oath months before that he had attended the court-ordered individual therapy, anger management and domestic violence counseling at Cooper and had been doing so for the last "[t]hree or four years," the records the Division obtained from Cooper proved otherwise. The Division entered into evidence, without objection, collateral reports submitted by Dr. Utreras and Sally French, a psychiatric advanced practice nurse at Cooper.

Utreras reported that Malcolm suffered from "depression — bipolar disorder, PTSD, morbid obesity, obstructive sleep apnea, diabetes mellitus and gait difficulty," attaching a three-page list of prescribed medications and modalities. Asked whether he had any concerns regarding Malcolm that the Division should be aware of, Utreras wrote that Malcolm "has significant medical problems and significant ambulatory difficulty that may affect his ability to take care [of] a minor."

French reported she had seen Malcolm four times as of January 9, 2019 — three times in May and June 2017 and once in September 2018. French reported Malcolm had been in therapy "but provider stopped seeing him for no shows." Asked whether she had any concerns about Malcolm that the Division should be aware of, or which need its attention, French answered, "don't know him well enough."

Over Malcolm's objection that the report was stale, the judge permitted the Division to introduce Malcolm's psychological evaluation from May 2018, for the purpose of establishing Malcolm's recommended services. Asked by the psychologist his understanding of the reason for the evaluation, Malcolm responded: "(DCPP) needs another weapon in order to take my kids from me. Although they found all the allegations were a lie against me — so their cover

47

is they need a fall guy and they have been giving me all kinds of crap." Asked to clarify how the Division became involved with his family, Malcolm elaborated:

> I called for help. I called every time [Alice] would come home, every time I couldn't move. [Alice] got caught on drugs and prostitution while I was sick. Her mom gets her into this. They will lock [Alice] into a room and make her have sex with people to get money for drugs. It upsets me that my own family snuck behind my back and when she said, 'No.' They raped her. I called them about help. They said it wasn't needed. I tried to tell them and for two or three years they ignored it. They said, me and [Alice] were fighting but [Alice] was in labor and I was trying to help her. They took our kids saying that we were fighting, and the court said they couldn't do that.

Malcolm advised the psychologist he was the divorced father of seven children, the oldest twenty-three and the youngest, Henry, then three-months-old. He reported being beaten as a child, with an absent father and a mother who "hated" him. He spent four years in foster care. He recounted childhood behavioral problems, including fighting, defiance, bedwetting and anger issues. In addition to the medical problems already discussed, he reported being hospitalized for emotional, behavioral or psychiatric reasons five times beginning in middle school up until two years prior to the evaluation. He also reported having been diagnosed with PTSD, bipolar disorder, and depression.

A-4052-18

He claimed to have last worked in 2009 and that his only income was from "disability."

Malcolm also reported a number of problems dealing with the Division, saying, "When I do nothing, they lie on me. They took my kids for no reason and they lie on me. They made up a story about a fight between me and [Alice] even though we proved it in court." Malcolm told the psychologist:

> I asked for counseling in the beginning and (DCPP) ignored me and then they asked me to do counseling after they took my kids. They told [Alice] and sent her around a bunch of drug dealers. The supervisor sat here and said it was ok. My doctor says the stress is going to kill me. I'm not a bad parent. I just have a big mouth. I offended a few people I hear, and they took it personally and they are making a case against me.

The psychologist concluded Malcolm was a forty-year-old man of average intelligence with poor insight and judgment, who often blamed others for his problems instead of taking responsibility for his actions, and who "spends excessive time and energy thinking about his health concerns." In light of Malcolm's prior significant psychiatric diagnoses and history of maladaptive behavior, the psychologist recommended he have a psychiatric evaluation by a board-certified psychiatrist "to review his current psychopharmacological treatment." The psychologist also recommended

49

Malcolm participate in a batterer's intervention program and anger management services as well as "receive individual counseling/psychotherapy with a licensed or qualified clinician to address his past trauma, anxiety, depression, delusional beliefs, and grief issues related to his loss of functioning from his health issues, as well as improve his problem-solving skills and coping skills."

Noting Malcolm's representations that "he needs 24/7 assistance to care for himself" and that his persistent health problems render him unable to care for a child — along with his behavioral history — the psychologist did not support Malcolm being an independent or sole parent to Henry. She further recommended reunification not be considered until Malcolm had complied with all recommended services.

Malcolm testified there had never been any physical violence between him and Alice after he completed the batterer's intervention program. When the law guardian sought to clarify on cross-examination that Malcolm completed the program before Henry's removal, Malcolm asserted he'd "done one a year, it seems like, over the last two or three years. Every year, I've done one. And completed it." When the deputy challenged Malcolm's assertion that there had been no physical violence between the couple after he

50

completed the batterer's program with reference to Alice's multiple hospital visits in 2017, Malcolm responded that "[Alice] was enwrapped in a situation. Okay? A bad situation. Now, I'm not fully sure of these times or whatever, but I'm telling you, it was verbal." Malcolm admitted taking Alice to the hospital but denied it was the result of domestic violence. When the deputy asked whether it was true the police had been dispatched to the couple's home multiple times in 2018, following Henry's birth, Malcolm claimed it was "virtually impossible" because he was homeless and living in his truck.

Asked about the incident at Dunkin Donuts, Malcolm explained that the argument had been the result of some "false information" given to him by the former permanency worker and Alice, and that he "didn't understand the situations that were at hand." When the deputy asked what he was talking about, Malcolm explained he had accused Alice of infidelity but later learned he had been "completely wrong" because his stepson and "his kids' mom" had been "beating on [Alice]. They were locking [Alice] in a room." Malcolm admitted yelling at Alice and videoing the incident on his phone, that the police had to be called, and that he had later posted the video to social media but refused to answer whether Alice had been crying during the incident, claiming the deputy was trying to "lead" him.

A-4052-18

When the deputy sought to explore the physical and emotional limitations Malcolm had claimed throughout the litigation, he declined, saying he was "covered by HIPAA" [the Health Insurance Portability and Accountability Act] and didn't "have to discuss that with [the deputy]." When the deputy asked whether Malcolm still had "anger issues," referencing the incident with the therapist Malcolm had ordered off his property and the one two months previous leading RENU to stop supervising the couple's visits with Henry, Malcolm responded: "you can't call a person with disabilities oh, you got anger issues. No. It's just misconception. When I was growing up, they called you emotionally disturbed, not autistic. You need to stop."

Alice testified at length. Her counsel began by asking her as Malcolm's "caretaker," whether she knew the source of Malcom's anger. Alice responded:

> [Malcolm] and I weren't communicating about a lot of things. There was a lot of mistrust and a lack of communication in our relationship. There were things that we were dealing with on top of added stressors; financial stressors, stressors from the Division, stressors from family, family on all sides, intervening in our relationship and with our children. So there was multiple things going on that — that — that would cause some of the — the anger that was going on. He also has multiple disabilities and medications and some of those disabilities that he has contribute to some of the mood swings . . . that he goes through on

52

occasion, some of the temperaments . . . that can come with those highs and lows.

Asked whether she thought that was "what happened at Dunkin Donuts," Alice replied:

> I think Dunkin Donuts was a combination of things. It was him getting told things that weren't factual, things that he misunderstood that we did later on, and were able to work out and — better communicate. I think that the combination of us at the time being homeless, the stressors of having to figure out where we were going to stay, how we were going to eat, and wash and so forth, those were added things. On top of the fact, he wasn't able to sleep properly. He wasn't getting — if you want to look at it in medical terms, he wasn't really even able to get the proper oxygen to his brain because he couldn't use his CPAP machine in the car.[11] So there's — there's many, many factors that played into that one moment that was videotaped. I mean, I don't — I'm not condoning the situation or how it was handled or anything else, but I can recognize all the factors that played into it as well.

Asked about her reluctance to complete services as the Division's witnesses had testified, Alice claimed she had completed every service she'd been given and wanted to continue with individual counseling to assist her in dealing with issues in her life and strengthening her relationship with Malcolm "but without that umbrella of domestic violence still attached." Alice insisted

---

[11] Malcolm testified he had been diagnosed with sleep apnea and used a CPAP [continuous positive airway pressure] machine while he slept.

she and Malcolm "both have always asked consistently what needs to be done, what can we do to get it done, when can it be done. We have always advocated to make sure things are completed because we didn't want to be stuck at the last minute with having to do something."

Although admitting "we've had some emotional abuse," Alice denied that Malcolm had ever abused her physically. Asked by the deputy about the incident in 2013 when she had to have stitches after Malcolm hit her with a broom, Alice admitted she'd been hit by a broom Malcolm had thrown, but claimed he hadn't thrown it "directly at [her]." She claimed Malcolm "was dealing with a medical issue with his sugar," and the broom "bounced" and hit her, but that was the only time she'd required medical treatment. When the deputy followed up by asking whether Alice had gone to the emergency room in 2017, she admitted she had after she was "jumped" by "a group of people in Paulsboro." When the law guardian followed up about another incident in 2017 when Alice presented at the emergency room in October with choke marks on her neck and a hematoma on her head claiming she'd tripped, Alice denied telling hospital staff she'd tripped.

Questioned about the number of times the police had to be called to respond to arguments between her and Malcolm, Alice acknowledged the

A-4052-18

couple had had "[p]lenty of verbal disagreements," when the police had been called to their home, but claimed they were "[n]ot always because of domestic violence. Some of those were medical. And sometimes, the police listed them as DV when they were not DV, they were medical."

Asked about the incident at the laundromat, when Alice was reported to have locked herself in the bathroom to get away from Malcolm, Alice claimed she had walked from her home and locked herself in the bathroom at the laundromat "[b]ecause [she] wanted to get away from the environment [she] was in at the moment." When the deputy asked why she couldn't just admit she was trying to get away from Malcolm, Alice responded that "it wasn't [Malcolm] that I was getting away from." Asked to explain what she was trying to escape, Alice responded:

> My children had been taken. My son had — had — I
> wanted to be — I've been dealing with and I have been
> working through, with counseling, anxiety and
> everything else because of my children being taken,
> because of the stress that we've been put under from
> the Division, and other — and other outside sources.

That led to the following exchange:

> The deputy: So you chose that day to go to the
> laundromat and lock yourself in the bathroom because
> of what the Division did? Is that your testimony?
>
> Alice: [Malcolm] has multiple disabilities.

The deputy:  I didn't ask you that, about [Malcolm].

Alice:  [Y]ou asked me a question and I'm giving you an answer.

The deputy:  I asked you why did you lock yourself in the laundry room.

Alice:  Well, if you'd let me finish my sentence, I'll tell you.

The deputy:  But don't tell me about [Malcolm].

When Alice's counsel claimed the deputy was badgering the witness, the judge responded:

[T]he question is pretty clear. I'm going to give Ms. [] a little time to answer the question.  But Ms. [] it seems to me . . . my reading of it, and I have to judge credibility here.  It seems like you're being a little bit evasive to answer the question, but I'll give you a little more time to properly answer the question.

Alice apologized, saying she wasn't intending to be evasive, and answered the deputy's question as follows:

Alice:  [W]hat I am trying to say is that [Malcolm] and I have had disagreements.  We have had verbal disagreements.  Things will get heated, discussions will get heated.  As we were discussing and going through what we were going through to get to the point where we are now, which is better than where we were, yes.  There were — there were discussions that we would have that would get elevated and escalated and sometimes, we would have to move

A-4052-18

away from each other and allow that space to take place.  Sometimes it was because sugars were low.  Sometimes because — it was because of various —

The court:  Is that what happened on December 13 of 2017, Ms. []?

Alice:  Yes.

The court:  Okay.

Alice: [Malcolm] — [Malcolm's] sugars were off.

The court: Was that the reason why you locked yourself in the bathroom, as asked by [the deputy]?

Alice:  Yes, sir.

The deputy:  Okay.

Alice: So that I could get some space and he could cool down.

Asked next about the police being called to a tire store in February 2018, a month after Henry's birth, Alice explained:

We were having a disagreement about the fact that our son was taken and — whether or not we should continue to move forward with our relationship, whether or not I should just leave and go down south, whether or not he should leave and go out west.  I mean, there was many things that we were having a discussion for at that time and that's where things went.

When the deputy read from the police report of the incident that Alice told police they were arguing "because [Malcolm] was again accusing her of cheating on him," Alice replied "[w]hich is what I just said.  We were having a discussion about the things that we were dealing with in our relationships."  When the deputy responded that Alice hadn't "mention[ed] the cheating part," Alice said "Okay.  Well, we were discussing things that we're dealing with in our relationship."

The deputy next asked Alice to explain the Dunkin Donuts incident in November 2017 in her own words.  Alice responded:

> We were homeless at the time. We were living in our car.  We were having to wash up in our storage facility because we didn't have anywhere else to go.  We turned to the Division and asked them for assistance, whether it was finding a shelter, whether it was finding a medical facility for [Malcolm] to stay in until we could get some — some sort of resolution to where we could stay.  And there was no response or assistance from them at all.
>
> At that particular day, I know that [Malcolm] was not feeling well on top of the fact that he had been told information that was incorrect.  And the information that he was told was — was upsetting.  And with some bipolar and PTSD and things that he has and — on top of his sugars and everything else that was going on and lack of sleep and stress of not knowing what we're going to do from day to day, everything kind of compiled and he got upset.

That led to the following exchange:

The deputy:  He got upset. And what did he do?

Alice:  And he was yelling. And he was accusing. And he was just very angry.

The deputy:  Okay. And what else did he do?

Alice:  He videotaped his anger.

The deputy:  Okay. And Dunkin Donuts personnel had to intervene?

Alice:  Yes.

The deputy:  Okay. And the police were dispatched there?

Alice: They were.

The deputy:  Okay.

Alice:  And they addressed his medical needs at the time.

When the deputy asked about the psychologist's report and the worker's testimony that Alice had not stayed to complete her psychological evaluation, Alice claimed the psychologist told her she could come back another day to finish it.  The deputy concluded his cross-examination by asking Alice if she believed she'd had enough counseling and education about domestic violence. Alice replied that she had completed all the workshops and accomplished all

her goals and believed she had "a very good understanding, a strong understanding of domestic violence." Asked whether if Henry were returned to her care, she had a place "independent of [Malcolm]" to stay, or any income beyond what she was receiving as his caregiver, Alice admitted she did not.[12]

Alice testified, "Yes, I could leave [Malcolm] and go on the rest of my life. But he's the father of my children. He's also disabled. And no matter what happens here and at this moment, for the rest of my life . . ." Alice also explained that Malcolm was "not physically fit to handle [their] kids on his own," which was why they were "doing this together." Alice explained Malcolm "shouldn't be excluded from being able to be with his children because of the disabilities and because of the things that he has to contend with, medically, and physically."

The court questioned Alice about the testimony offered by the Division that the inappropriate and angry interactions between her and Malcolm, as well as between them and the individuals trying to assist them in putting their family back together, that were present in 2017 and 2018 continued into 2019 with RENU refusing to further supervise their visits with Henry. Alice

---

[12] Alice claimed she got "$20 on occasion" for child support arrears from her ex-husband but also admitted she'd recently been arrested for non-payment of support herself.

explained that Malcolm had not been "trying to have a situation" but the visit broke down because the Division worker "was pretty much belligerent" in refusing to respond to Malcolm's request that the worker advise RENU about the couple's compliance with services. When the judge summarized Alice's response by asking,"[s]o that's the reason why the visit broke down on January 7th with RENU? It was someone else's fault? It had nothing to do with you or [Malcolm] or anyone else," Alice responded by explaining she was "not saying that how things disbanded were correct," but "you have to understand. We have been through a lot of things, but we have made tremendous strides of progress and [moved] tremendous amounts forward."

The judge pointed out the testimony from Alice's older daughters about the abuse they had witnessed between Malcolm and Alice and asked whether she would "agree that your children learn from that?" Alice agreed and also agreed with the judge that she wouldn't want her children treated the same way.

The judge also asked Alice about defendants' failure to have visited Henry in the four weeks since RENU had terminated its services and their visits had been moved to the Division's office, notwithstanding the Division providing their transportation, and the reports that Alice had not called or

61

written to her children living with Dahlia in Virginia. As to their failure to visit Henry, Alice claimed "It hasn't been that we haven't tried. Three of those times, transportation never showed up to our home. The other time, [Malcolm] wasn't feeling well. His back was hurting. He ended up in the hospital later that week because of those issues." As for the children in Virginia, Alice claimed she didn't have an address or phone number for her mother.

After the close of the testimony, the Division and the law guardian urged the court to approve the Division's plan and grant custody of Henry, who was not in a pre-adoptive home, to Dahlia.[13] Both argued the domestic violence that caused the first removal in 2016 had not abated, despite the many services the Division had endeavored to provide the couple. They noted Malcolm had never attended the partial care program ordered in the first Title 30 proceeding, nor the counseling he claimed to have been doing at Cooper. The couple thwarted the domestic violence and other services the Division arranged to have provided in their home based on their insistence of doing all services together. The law guardian noted Malcolm continued to exhibit angry,

---

[13] Both the deputy and the law guardian noted approval of the Division's plan would require a change in Henry's placement, because the resource parents who had cared for Henry since his birth had never offered themselves as a permanent placement option.

threatening behavior and Alice continued to make excuses for him. The deputy agreed and added that although both denied Malcolm physically abused Alice, the proof of emotional abuse was overwhelming. He argued it was undisputed that Malcolm could not independently parent Henry and that Alice would not do so, and that the two of them could not together provide him a safe home.

Counsel for Malcolm argued the Division had proved nothing other than some verbal disputes between a couple "trying to work on a very difficult situation they found themselves in." Counsel maintained the two were obviously experiencing some difficult times, but nothing rising to a level that would require Malcolm complete another round of batterer's counseling. He argued the Division had not made any reasonable accommodation for Malcolm's disabilities in the provision of services and that the Division's plan should be rejected.

Counsel for Alice argued for more time. He maintained Alice was doing well and that with reasonable accommodations for Malcolm's disabilities, Malcolm should be able to complete the services the Division wanted completed, making termination of parental rights unnecessary. He suggested

A-4052-18

the court reject the plan "and that we come back in thirty days and see where we are."

Following the hearing, the court put a lengthy decision on the record approving of the Division's plan of termination of parental rights followed by adoption, or custody with Dahlia, and granting Dahlia custody of Henry. The court summarized the testimony of the witnesses and referred at length to the RENU report chronicling Malcolm and Alice's visits with Henry and to the psychological evaluations of both.

The judge found Malcolm and Alice's relationship had been plagued by persistent domestic violence for a number of years, certainly going back to the time the children were first removed in 2016. The judge found the Division witnesses credible and that the Division had offered the family numerous reasonable services without any significant effect. The judge found Malcolm had failed to complete services, notwithstanding the Division made them available in his home. As to Alice, the judge noted an indication in the evidence that it was possible she could regain custody of her children, "but not at this date."

The judge noted the many opportunities provided Malcolm and Alice to complete services and bond with Henry. But instead of progressing to

unsupervised time with their infant, Malcolm and Alice's visits were ultimately attended by Human Services police for the safety of everyone concerned, after RENU refused to work further with the family in light of Malcolm's abusive and unpredictable behavior. The judge concluded he could not leave a child in an environment where he would be exposed to ongoing domestic violence whether of a physical, verbal, or emotional nature.

In light of his approval of the Division's permanency plan, the judge found it was in Henry's best interests "not to be in a non-related resource home." In an effort he characterized as trying "to maintain some semblance of family for the child," the court awarded custody of Henry to his maternal grandmother, Dahlia, where he could live safely with his brother and sisters.

Although Malcolm and Alice raise a multitude of points on appeal, their claims reduce to four broad arguments. They contend the trial court erred in allowing Dahlia to intervene in the FN case; improperly relied on unspecified evidence from the prior FN action, as well as hearsay and the opinions of a psychologist the Division did not call to testify, to support its findings in this FN matter and award custody to Dahlia in the FD action; that the combined proceedings denied them due process; and that they received ineffective assistance of counsel. We address each in turn.

A-4052-18

There is, of course, no question but that parents have a constitutionally protected right to raise their children. In re Guardianship of J.C., 129 N.J. 1, 9 (1992). Although fundamental, that right, however, is not absolute. In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). It is tempered by the State's parens patriae obligation to protect the welfare of children. J.C., 129 N.J. at 10. Those precepts guide our analysis.

Alice and Malcolm claim the court erred in allowing Dahlia to intervene in the FN case, with Alice arguing it "tainted" the FN proceedings. We reject those arguments.

The record makes clear that neither Alice nor Malcolm objected to Dahlia's intervention in the FN matter. As noted above, Dahlia filed her request to intervene in the FN case before the return date on the Division's order to show cause following Henry's removal, and the court entertained the request on the return date. Neither Alice nor Malcolm objected; their lawyers objected only to Dahlia's further request that Henry be placed with her in Virginia, with Malcolm's counsel also objecting to the lack of notice of Dahlia's application for custody.

We agree Dahlia's intervention in the FN case could not have been granted as of right under Rule 4:33-1, see Meehan v. K.D. Partners, L.P., 317

N.J. Super. 563, 568 (App. Div. 1998), but permissive intervention under Rule 4:33-2 has been recognized in such cases, although we've noted it's "not the preferable method of proceeding," B.C. v. N.J. Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 207-08 (App. Div. 2017). As we review orders for permissive intervention only for abuse of discretion, New Jersey Dep't of Envtl. Prot. v. Exxon Corp., 453 N.J. Super. 272, 286 (App. Div. 2018), neither defendant objected to Dahlia's pro se participation in the FN case, and we do not find that either Alice or Malcolm suffered any prejudice by her participation, we find no cognizable error in Dahlia's intervention in the FN matter.

We also agree with defendants the court should not have relied on unspecified evidence from the prior FN/FD actions in these proceedings, see N.J.R.E. 201(e), and that it was error for the court to have admitted over defendants' objections the expert reports of Alice's and Malcolm's psychological evaluations under Rule 5:12-4(d), absent consideration of whether the opinions contained therein were too complex and subjective to admit under N.J.R.E. 808 without permitting defendants the opportunity to cross-examine the expert. See N.J. Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 174 (App. Div. 2012).

A-4052-18

The deputy's continued insistence that the Division need only present material and relevant, not competent, evidence in this Title 30, section 12 proceeding, which the court accepted, was clearly erroneous. See N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 260-61 (App. Div. 2002). The Division's position in the trial court that it did not need to present competent evidence is particularly concerning in a case where it was presenting concurrent plans of termination of parental rights followed by Henry's adoption or transfer of his custody to Dahlia without termination. That position could result in the parents being stripped of the right to raise their child based on incompetent evidence, a result clearly incompatible with statute and case law. See id. at 265.

But having reviewed the competent evidence in the record, we cannot find those errors prejudiced defendants or undermined the judge's findings. Alice and Malcolm complain the court's first summary finding that this was a family in need of services under Section 12 was not supported by the evidence in light of Alice's testimony that she and Malcolm were no longer homeless and were engaged in previously ordered services and Malcolm's testimony he had completed all previously ordered services, except for a partial care

A-4052-18

program, which he claimed the Division had advised him was no longer necessary.

They fail to acknowledge, however, that the judge, relying on the prior FN matter having been dismissed only weeks before with neither Alice nor Malcolm having completed services and their visitation with their children remaining supervised, granted temporary custody of Henry to the Division — subject to a self-executing order that Henry be returned to them if the Division confirmed, at a meeting he ordered the Division to have with defendants the following day, they had completed their services. Custody was not returned, however, because, in a pattern that repeated itself over and over in this case, the Division could not verify defendants' sworn representations to the trial court. While defendants were no longer homeless, Alice was wait-listed for individual therapy and had not started domestic violence counseling, and Malcom was not participating in any services.

Defendants similarly protest the judge having taken judicial notice of the long history of domestic violence between Malcolm and Alice, "where that evidence has come in previously," including hospital visits and police intervention, without any hospital records or police reports having been entered into evidence. But that overlooks the extensive testimony by Alice

A-4052-18

and Malcolm about the history of their volatile relationship, Alice's visits to the hospital and the many times the police were called to intervene in arguments between the two.

Specifically, Alice admitted she'd had a cut on her head stitched in 2013 after Malcolm threw a broom and had twice visited the hospital in 2017 with physical injuries, once with a head injury and another time with choke marks on her neck and a hematoma on her head — although denying in the latter two instances that Malcolm had caused her injuries. Alice also testified to the many times the police had been called to their home and particularly about three occasions in late 2017 and early 2018, after Henry was born, when she'd had to leave home to get away from Malcolm, only to have him follow her to a Dunkin Donuts, a tire store and a laundromat, where she'd had to lock herself in a bathroom until police arrived. The court's finding of a long history of domestic violence between Malcolm and Alice, if only limited, as Alice claimed, to "emotional abuse," was well supported by the parties' own testimony.

That brings us to the admission of the expert reports without the Division presenting the expert to testify. The law on this point is well settled. Rule 5:12-4(d) permits the Division "to submit into evidence, pursuant to

N.J.R.E. 803(c)(6) and 801(d)," reports of professional consultants, such as the psychologist who evaluated Alice and Malcolm. The Rule further provides "[c]onclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal."

Thus, admissibility of the reports depended first on satisfaction of the prerequisites for admission of a business record under N.J.R.E. 803(c)(6). See N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 495 (App. Div. 2016). Even if the reports vault that hurdle, as these did, see N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 524 (App. Div. 2017) (noting "[r]eports are admissible when they are prepared by a professional consultant of the Division . . . for the purpose of guiding the Division in determining the appropriate course of action, and when they are maintained in the regular course of the Division's business"), when the Division does not offer the expert as a witness, the expert's conclusions and diagnoses must satisfy the strictures of N.J.R.E. 808. See New Jersey Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 158 (App. Div. 2018). "Expert diagnoses and opinions in a Division report are inadmissible hearsay, unless the trial court specifically finds they are trustworthy under the criteria in N.J.R.E. 808, including that they are not too complex for admission without

the expert testifying subject to cross-examination." N.T., 445 N.J. Super. at 487. Statements Alice and Malcolm made to the evaluator were admissible under N.J.R.E. 803(b)(1) as the statements of a party-opponent. See State v. Covell, 157 N.J. 554, 572 (1999).

In rendering his opinion following the March 12, 2019 hearing, the trial judge quoted extensively from the psychologist's evaluation report of Alice, stating he found it "very significant" for his decision. Chief among the psychologist's findings quoted by the judge was that Alice "appears to downplay, minimize, and rationalize [Malcolm's] aggressive behaviors," noting Alice "denied being the victim of domestic violence despite requiring frequent emergency medical care in 2017," and her "explanation of her injuries was at times not consistent with her actual injuries." The judge also quoted the psychologist's finding that Alice, while denying she was "the victim of domestic violence, . . . demonstrated behavioral characteristics often associated with being the victim of domestic violence," in that "[s]he appeared evasive about the abuse, has visited the hospital multiple times, provided false or inaccurate information regarding the abuse and the cause of some of her injuries, demonstrated overly solicitous behavior and was overly protective of

72

[Malcolm], downplaying and excusing his behaviors as due to his mental health and physical problems."

The judge further quoted the psychologist's finding that Alice "has remained in a relationship with [Malcolm] despite the removal of her children and inability to be reunited with them due to . . . continuing the relationship with [Malcolm] who was found to be a danger to her children due to his aggressive behaviors."  The judge "note[d] for the record" that he was the judge who "conducted those hearings" had heard Alice's older children testify, had found them "to be credible and made [his] findings to remove those children."

The judge quoted the psychologist's opinion that the four "most relevant" factors in evaluating a parent's fitness were nurturance, which "is the ability to understand and meet a child's physical and emotional needs"; protection, "the ability to recognize hazards and/or harmful physical and psychological situations and to mitigate the potential of harm"; stability, "the ability to maintain a consistent, predictable, and calm environment"; and guidance, "the ability to use reasoning and judgement to teach and supervise her children." And the judge quoted the psychologist's findings that Alice is not able to protect her children "due to her continued involvement with [Malcolm]," who

73

"was found to be a danger to her children," and who had "at times refused and created barriers to engagement in recommended services that may allow the children to be reunited" with her; that Alice's "decision to remain in her relationship with [Malcolm] suggests she does not recognize the potential harm to her children"; that she has, thus, "failed to prioritize her children's safety and stability over her relationship" with Malcolm; that while Alice "appear[ed] to have relatively stable housing, yet she lives with her abusive paramour and her sole employment is caring for him," suggesting their home "environment would not be a calm one"; and finally that Alice "has not demonstrated the ability to use good reasoning and judgement to provide a safe environment for her children" because "[s]he denies being in an abusive relationship despite being presented with evidence to the contrary," and her decision to remain with Malcolm "provides a model to her children that demonstrates violence is an acceptable part of relationships."

While we have agreed with defendants that the judge should not have admitted the psychologist's reports without considering whether the expert's diagnoses and opinions were "not too complex for admission without the expert testifying subject to cross-examination," N.T., 445 N.J. Super. at 487, it is equally obvious to us that the psychologist did not diagnose Alice with any

psychological disorder.  Moreover, her opinions about Alice on which the court relied were not at all complex, and, indeed, are no different from the sort of practiced observations Family Part judges make regularly in hearing domestic violence and children in court matters.  See Cesare, 154 N.J. at 413; Brennan v. Orban, 145 N.J. 282, 305 (1996).  Accordingly, we find no error in the admission of the psychologist's opinions about Alice's ability to safely parent Henry.

As to Malcolm, both he and Alice repeatedly noted to the judge that Malcolm had been diagnosed with PTSD, bipolar disorder and depression, with Malcolm reporting to the psychologist he'd been hospitalized several times for emotional or psychiatric reasons, most recently as two years ago.  In light of those previous diagnoses, Malcolm's extensive list of prescribed medications and the many reports of his maladapted behavior, the psychologist recommended he undergo a psychiatric evaluation by a board-certified psychiatrist.  Malcolm never did so, despite the Division offering that the evaluation could be performed by Malcolm's treating psychiatrist at Cooper.

When the deputy attempted to explore Malcolm's psychiatric history with him at the hearing, he refused to answer, on HIPAA grounds, and both Malcolm and Alice refused to provide releases for Malcolm's treatment at a

A-4052-18

crisis unit on the same day Alice sought treatment in the emergency room during the pendency of this proceeding. While we conclude the judge should have excluded under N.J.R.E. 808 the psychologist's diagnoses of Malcolm "appear[ing] to meet the DSM-5 criteria" for PTSD, bipolar disorder and antisocial personality, we cannot find the error requires reversal in light of Malcolm's own assertion of having been diagnosed with PTSD and bipolar disorder, and his concession that his physical disabilities prevented him from caring for Henry. The expert's opinions and diagnoses of Malcolm were simply not central to the court's finding that Malcolm could not resume care of Henry. See N.T., 445 N.J. Super. at 503.

We also find no error in the trial court's admission of and reliance on RENU's closing summary of the supervised parenting services provided to Alice and Malcolm, including the several times visits had to be cut short based on Malcolm's angry and aggressive behavior and RENU's decision in January 2019 to close out services based on Malcolm's continued inappropriate behavior and the family's lack of progress. Neither Alice nor Malcolm objected to the admission of the RENU report, and its admission under Rule 5:12-4(d) was certainly well within the court's considerable discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382 (2010).

We likewise find no error in the admission of the collateral reports the Division obtained from Sally French and Dr. Utreras. As we have recounted in some considerable detail, this case was marked by two unusual and intertwined factors: Alice and Malcolm's insistence on only participating in services together; and their repeated representations that they were receiving from non-Division-recommended providers the services the Division required. After the Division worker testified at the September 2018 hearing that Malcolm had never completed the partial care program he was ordered to complete in the first FN action and was not participating in any Division recommended services, Malcolm testified his doctors at Cooper Hospital had been managing his medication and providing him individual therapy, anger management and domestic violence counseling for the last several years.

Although the deputy questioned Malcolm's representations, Malcolm's lawyer argued the Cooper records would establish whether Malcolm had "been doing everything that he's been saying he's been doing and that the Division has been asking him to do all along or not." Given those circumstances, we find no error in the court's admission of the records.

Because it was essential that both the FN and FD matters be heard by the same trial judge "whether the FD complaint [was] heard at the same time as

the FN matter or not," B.C., 450 N.J. Super. at 206, we are also satisfied the judge's decision to entertain the FN and FD cases together, plainly allowed by our holdings in B.C. and N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 523 (App. Div. 2018), did not deprive defendants of due process or rob Alice and Malcolm of the presumption of custody in the FD action by Dahlia. The Court in Watkins v. Nelson explained the presumption in favor of natural parents, like the parents' right to raise their child, is not absolute but "must, at times, give way to the State's parens patriae obligation to ensure that children will be properly protected from serious physical or psychological harm." 163 N.J. 235, 246 (2000). Accordingly, the presumption in favor of the parents in a custody dispute with a third party may be overcome by "a showing of gross misconduct, unfitness, neglect, or 'exceptional circumstances' affecting the welfare of the child." Ibid.

Thus, as the Court explained in Watkins, resolution of "a custody dispute between a third party and a parent involves a two-step analysis. The first step requires application of the parental termination standard or a finding of 'exceptional circumstances.'" 163 N.J. at 253. The reasons for that are obvious: "[a]lthough an award of custody to a third party does not involve a termination of all parental rights, 'such an award destroys any pretense of a

normal parent-child relationship and eliminates nearly all of the natural incidents of parenthood including everyday care and nurturing which are part and parcel of the bond between a parent and child.'" Id. at 253-54 (quoting Zack v. Fiebert, 235 N.J. Super. 424, 432 (App. Div. 1989)). "If either the statutory parental termination standard or the 'exceptional circumstances' prong is satisfied," the court proceeds to the second step "to decide whether awarding custody to the third party would promote the best interests of the child." Id. at 254.

The law guardian contends the Watkins standard did not apply here because custody of Henry was in the Division, not Alice and Malcolm. We are not convinced of that, but it's an issue we need not reach because, unlike in Watkins, the judge here made an unequivocal finding that neither Alice nor Malcolm was fit to resume custody of Henry after an evidentiary hearing, thus overcoming their presumption of custody. See id. at 255-56 (explaining because "the Nelsons did not allege, and the evidence failed to establish," that the child's surviving parent, Larry Watkins, was "an unfit parent," the best interest standard should not have been applied to their custody dispute).

Contrary to arguments made in defendants' appellate briefs, the court's finding was not based simply on Alice and Malcolm's failure to complete

services.  The judge found, based on competent evidence in the record consisting largely of their own testimony, that defendants' relationship was marked by unremitting domestic violence over several years.  Although Malcolm never underwent the recommended psychiatric evaluation by a board-certified psychiatrist, his statements, both on the record and to the Division's psychologist, about Alice being "caught on drugs and prostitution," her mother locking her in a room and "[making] her have sex with people to get money for drugs," that his own family "beat[] on" and "raped her," that the Division worker ignored his pleas for help and ordered he be "forcefully taken away from [his] home" and then "had a male that was interested in [Alice] directed" to their home, were beyond concerning and could not responsibly be ignored by the court.

In addition, Malcolm made repeated reports to the Division that Alice was using drugs, although there's no indication in the record she did so and her hair follicle test, which the Division only required based on Malcolm's allegations, was negative.  Malcolm never denied making the accusations, instead he told the court he wanted "everyone" tested including Dahlia, whom he insinuated only came to New Jersey to buy drugs.  While both Malcolm and Alice insisted that Malcolm was receiving services "independently," the

80

evidence in the record made clear — not only that he was not receiving such services — he was not being treated for his previously diagnosed bipolar disorder, PTSD and depression. Those facts and the many reports by Division workers and service providers of Malcolm's erratic and aggressive behavior, resulting in providers refusing to continue services and Human Services officers attending Alice and Malcolm's supervised visits with Henry, amply supported the court's finding that Henry was not safe in his care.

While Alice suffered from no diagnosed psychiatric disorder, her unwillingness to acknowledge the risks Malcolm posed to Henry, and her apparent inability to part from Malcolm, even to obtain independent services, notwithstanding that their relationship had already cost her custody of her older children, constrained the court to find Henry was not safe in her care either. Alice did not maintain a cell phone and testified she did not drive. It takes little imagination to foresee the risks to Henry should he be in her care when Malcolm's "mood swings" or "low sugars" cause her to flee their home, on foot, to take refuge at a local business where employees will call police or she can lock herself in the bathroom until Malcolm "could cool down."

As the Court has observed, "[w]hen custody issues become intertwined with child-protection actions, then dispositional questions that lie at the

81

intersection of the two matters become complicated by a parent's delay in achieving circumstances that make it safe for the child to return to the former custodial parent."  N.J. Dep't of Children & Families, Div. of Youth & Family Servs. v. I.S., 214 N.J. 8, 41 (2013).  It was here.  Despite fairly extraordinary efforts by the Division over fourteen months, all of Henry's young life, the circumstances that led to Henry's removal — Malcolm's erratic and abusive behavior and Alice's tolerance of and excuses for it — had not changed, making clear that Henry could not be safely returned to their custody.  See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 292 (2007).

We reject defendants' contention that Dahlia's intervention in the FN case and the court conducting the FN and FD proceedings in tandem turned the Title 30 matter into a custody contest between them and Dahlia, "short-circuiting an appropriate dispositional conclusion to the Title 30 litigation." When the court approved the Division's permanency plan of termination of parental rights, followed by adoption or assumption of Henry's custody by Dahlia, Henry was in a non-adoptive resource home where he had resided for fourteen months.  Because he could not be safely returned to his parents, the trial court's choice was not, as defendants contend, between returning Henry to them or placing him with Dahlia; it was between moving him to a pre-adoptive

resource home in anticipation of a guardianship action or granting Dahlia's FD application for custody. The record makes clear the court considered Henry's best interests in making that decision, which is entitled to our deference. See Cesare, 154 N.J. at 411-12. As in I.S., "it would require blinders" for us not to recognize that granting custody of Henry to Dahlia, who was already raising his siblings, "was an appropriate disposition to end the Title 30 proceedings." I.S., 214 N.J. at 41. Doing so provided Henry a secure placement with his siblings and preserved Alice's and Malcolm's ability to regain custody of him on a changed-circumstances showing, instead of exposing them to the very real possibility of termination of their parental rights in a guardianship proceeding. See S.D., 453 N.J. Super. at 524.

Although the unusual occurrence of an FN Title 30 Section 12 matter proceeding in tandem with a third-party custody application under the FD docket requires more particular attention to procedure than occurred here, Alice and Malcolm were provided notice and an opportunity to be heard at every critical juncture of these matters. The judge was solicitous of their rights throughout these proceedings and they had the benefit of competent counsel who vigorously advocated on their behalf in both the FN and the FD matters. Having reviewed this entire record, we find no basis for concluding

that counsel's representation "fell below an objective standard of reasonableness" or that there is any "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[14] Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). Defendants' arguments to the contrary are without merit.

Alice's and Malcolm's remaining arguments, to the extent we have not addressed them, lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[14] Although defendants claim their counsel failed to object to hearsay and oppose admission of the expert reports, a review of the record reveals counsel repeatedly objected to such and were often successful in blocking the introduction of harmful evidence, including, for example, the video Malcolm made and posted of the Dunkin Donuts incident. Other claimed derelictions, such as the failure to object to Dahlia's intervention in the FN case or counsel's failure to object to the court's continued jurisdiction two months beyond the six-month limitation contained in N.J.S.A. 30:4C-12, while examples of the court and counsel's failure to meticulously attend to the procedural requirements in these joint FN and FD proceedings, had no appreciable effect on the outcome.

A-4052-18